IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MEIJER, INC. & | : | |
| MEIJER DISTRIBUTION, INC., | : | |
| on behalf of themselves and | : | |
| all others similarly situated | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 04-5871 |
| 3M (MINNESOTA MINING | : | |
| AND MANUFACTURING COMPANY) | : | |

**MEMORANDUM**

**Padova, J.**                                                            **August 14, 2006**

Plaintiffs, Meijer, Inc. and Meijer Distribution, Inc. (collectively "Meijer"), have brought this class action antitrust lawsuit against Defendant 3M for damages arising out of 3M's allegedly anti-competitive conduct. Plaintiffs have reached a settlement with 3M, which the Court has preliminarily approved. Presently before the Court are Plaintiffs' Motion for Final Approval of Settlement (Docket No. 96) and Plaintiffs' Counsel's Motion for Attorneys' Fees, Expenses, and Incentive Award (Docket No. 97). After a Final Approval Hearing held on August 8, 2006, and for the reasons that follow, the Court grants both Motions.

I.      BACKGROUND

Meijer brings this action against 3M on behalf of itself and other members of a proposed class, which includes persons and entities who purchased invisible or transparent tape directly from 3M at any time from October 2, 1998 to February 10, 2006 and also purchased, for resale under their own label, "private label" invisible or transparent tape from 3M at any time from October 2, 1988 to February 10, 2006. Meijer alleges one count of monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, claiming that 3M unlawfully maintained monopoly power in the

transparent tape market through its bundled rebate programs[1] and through exclusive dealing arrangements with various retailers.  (Compl. ¶ 27.)  Meijer further claims that "3M has used its unlawful monopoly power . . . to harm Plaintiffs and the other Class members in their business or property by increasing, maintaining, or stabilizing the prices they paid for invisible and transparent tape above competitive levels."  (Id. ¶ 34.)  Meijer seeks relief for these overcharges.  (Id. ¶ 4.)

A.    Litigation History

The conduct of 3M that forms the basis of this class action lawsuit was the subject of a prior lawsuit before the Court, LePage's Inc. v. 3M, Civ. A. No. 97-3983 (E.D. Pa.).  In that suit, LePage's, Inc., a competing supplier of transparent tape, sued 3M alleging, inter alia, unlawful maintenance of monopoly power in violation of Section 2 of the Sherman Act.  The jury found in favor of LePage's.  See Le Page's Inc. v. 3M, Civ. A. No. 97-3983, 2000 WL 280350 (E.D. Pa. Mar.14, 2000), aff'd, 324 F.3d 141 (3d Cir. 2003) (en banc), cert. denied, 542 U.S. 953 (2004). Thereafter, Bradburn Parent/Teacher Store, Inc. brought a class action lawsuit against 3M on the basis of the conduct litigated in LePage's.  Bradburn Parent/Teacher Stores, Inc. v. 3M, Civ. A. No. 02-7676 (E.D. Pa.).  Bradburn, who originally had sought to represent a class which included Meijer, was ultimately granted certification of a modified class that excluded purchasers of private label tape, such as Meijer.  Bradburn Parent/Teacher Stores, Inc. v. 3M, Civ. A. No. 02-7676, 2004 WL 1842987 (E.D. Pa. Aug.18, 2004).  Having been excluded from the class in Bradburn, Meijer attempted to intervene in that lawsuit as an additional class representative.  In denying Meijer's

---

[1] In short, 3M's bundled rebate programs provided purchasers with significant discounts on 3M's products.  The availability and size of the rebates, however, were dependent upon purchasers buying 3M products from multiple product lines.  See LePage's, Inc. v. 3M, 324 F.3d 141, 154-55 (3d Cir. 2003).

Motion to Intervene, this Court noted that "there is nothing which would prevent Meijer from filing its own individual or class-action lawsuit against [3M] and presenting its claims in that forum." Bradburn Parent/Teacher Store, Inc. v. 3M, Civ. A. No. 02-7676, 2004 WL 2900810, at *6 (E.D. Pa. Dec. 10, 2004).

Accordingly, on December 16, 2004, Meijer filed a Complaint against 3M. On February 10, 2005, 3M moved to dismiss the Complaint on the grounds that it was barred by the statute of limitations and failed to allege an antitrust injury. Meijer filed its opposition to that Motion on March 11, 2005. On July 13, 2005, this Court denied 3M's Motion to Dismiss, but left open the question of whether and to what extent the statute of limitations should be tolled. See Meijer, Inc. v. 3M, Civ. A. No. 04-5871, 2005 WL 1660188, at *4 n.2 (E.D. Pa. July 13, 2005).

While 3M's Motion to Dismiss was pending, this Court entered a Protective Order negotiated by counsel for 3M and for Meijer, which allowed Meijer to begin receiving documents from the Lepage's and Bradburn cases as well as documents responsive to its own discovery requests. (Daniel A. Small Decl. ¶ 18.) Separately, individual lawsuits were filed against 3M by Publix Supermarkets, Inc. ("Publix"), a former member of the Bradburn class, and by Kmart Corporation ("Kmart"), a member of the proposed Meijer Class. (Id. ¶ 19.) On May 26, 2005, 3M moved for coordination of pretrial discovery among the four pending actions. Meijer responded on June 13, 2005, agreeing that such coordination was appropriate and suggesting modifications to 3M's proposed order. On July 20, 2005, the Court issued an Order coordinating pretrial discovery. Thereafter, Meijer participated in the merits discovery that was ongoing in Bradburn and, in collaboration with Publix and Kmart, established an online database to facilitate the compilation and review of documents and depositions. (Id. ¶¶ 22, 24.) On August 2, 2005, 3M filed its Answer to Meijer's Complaint with

affirmative defenses.

On September 6, 2005, Meijer moved for class certification under Federal Rule of Civil Procedure 23(a) and (b)(3); this Motion was supported by an expert affidavit from an economist, Professor Keith Leffler ("Leffler Declaration"). 3M filed its opposition to this Motion on October 26, 2005. Meanwhile, this Court, following a status hearing on September 26, 2005, suggested that the parties in the coordinated actions attempt to reach a settlement through mediation. (Id. ¶ 31.) The parties selected as a mediator Jonathan B. Marks, and the mediation occurred on November 8 and 9, 2005. (Id. ¶¶ 32-33.) Negotiations continued in the days immediately following the mediation, and ultimately resulted in a Memorandum of Understanding ("MOU"), dated November 21, 2005, that resolved the Meijer, Publix, and Kmart actions. (Id. ¶¶ 36-37.) Pursuant to the MOU, 3M agreed to pay a total of $30 million to settle the three separate lawsuits. (Id. ¶ 38.) Meijer, Publix, and Kmart then allocated that lump sum among the three actions in proportion to the relevant purchases of 3M tape represented in each action; under this allocation plan, all three parties settled their claims for the same percentage of their respective purchases. (Id.)

Subsequent to the execution of the MOU, counsel for Meijer and 3M spent approximately three months negotiating the details of their formal Settlement Agreement, which the parties signed on February 10, 2006. (Id. ¶¶ 39, 41.) On February 13, 2006, Meijer moved for preliminary approval of the proposed Settlement; on February 15, 2006, Bradburn moved to intervene for the purpose of opposing preliminary approval of Meijer's proposed Settlement and Settlement Class. Both Meijer and 3M opposed Bradburn's Motion and, on March 9, 2006, the Court denied Bradburn permission to intervene. On March 28, 2006, the Court issued an Order preliminarily approving the Settlement. That Order also preliminarily certified the Settlement Class for settlement purposes,

4

appointed Class Counsel,[2] and approved Meijer as Class Representative.  Additionally, the Order authorized the dissemination of Notice to the Settlement Class, scheduled a hearing for final approval of the proposed Settlement ("the Final Approval Hearing"), and set June 6, 2006 as the deadline for objections to the Settlement, requests for exclusion from the Settlement Class, or for filing a Notice of Appearance at the Final Approval Hearing.  Pursuant to the March 28th Order, Notice of the Settlement was disseminated through publication and first-class mail, and also was posted on a dedicated website.  (Id. ¶ 52.)  On May 23, 2006, Meijer filed the instant Motions for Final Approval of Settlement and for Attorneys' Fees, Expenses and Incentive Award.  The Motions were supported by a Declaration from Class Counsel attorney Daniel A. Small ("Small Declaration") and a second Declaration from Professor Keith Leffler ("Leffler Declaration II").

B.    The Settlement Agreement

1.    The Settlement Class

The Settlement Class, which was preliminarily certified by the Court, is defined as:

> all persons and entities that purchased invisible or transparent tape directly from 3M Company, or any subsidiary or affiliate thereof, in the United States at any time during the period from October 2, 1998 to February 10, 2006 and also purchased for resale under the class member's own label, any "private label" invisible or transparent tape from 3M or any of 3M's competitors from October 2, 1988 to February 10, 2006; but excluding 3M Company, its subsidiaries, affiliates, officers, directors, and employees and excluding those persons or entities that timely and validly request exclusion from the Settlement Class.

2.    Terms of the Settlement Agreement

---

[2] The Court appointed the following as Class Counsel: Daniel A. Small and Brent W. Landau of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT"); and Joseph M. Vanek of Vanek, Vickers & Masini, P.C. ("VVM," previously "Daar & Vanek, P.C.").

The Settlement Agreement provides for a cash payment of $28,889,128 to the Settlement Class; this amount was deposited in an interest-bearing escrow account on April 5, 2006. (<u>Id.</u> ¶ 42.) The Settlement Amount is approximately 2% of the total amount paid to 3M by members of the Settlement Class for invisible and transparent tape for home or office use during the Class Period. (<u>Id.</u> ¶ 43.) The Settlement Amount was subject to reduction and reversion to 3M as members of the Settlement Class requested exclusion. 3M had the right to terminate the Settlement if requests for exclusion exceeded 27.5%. The Distribution Plan calls for the Settlement Amount to be allocated among Class Members in proportion to their relevant purchases of 3M tape. All costs of administering the Settlement and of providing Notice to Members of the Settlement Class are to be paid out of the Settlement Fund. The Agreement authorizes Class Counsel to withdraw up to a total of $25,000 from the Settlement Fund for the costs of administering the Settlement and providing Notice to Members of the Settlement Class.

The Settlement Agreement requires that Members of the Settlement Class release and discharge 3M from any and all claims asserted, or which could have been asserted, in the litigation. The release includes all claims and potential claims concerning any 3M discount, rebate, offer, promotion, or other sales program or practice (including programs alleged to involve the bundling of products or volume or growth rebates), relating in any way to the sale, promotion, or distribution of invisible or transparent tape for home or office use, in effect from January 1, 1993 to the Settlement Agreement Date of February 10, 2006. The release specifically excludes claims relating to product defect, personal injury, or breach of contract.

The Settlement Agreement permitted Plaintiffs' Counsel[3] to apply to the Court during the Final Approval Hearing for an award of attorneys' fees and a reimbursement of litigation and settlement expenses incurred on behalf of the Settlement Class. The Settlement Agreement also allows Meijer, as Class Representative, to seek an incentive award for its services to the Settlement Class. The attorneys' fees, expenses, and incentive award are to be paid from the Settlement Fund prior to the Fund's distribution to the Class.

C.    Final Approval Hearing

On August 8, 2006, the Court held a Final Approval Hearing to address the Motions for Final Approval of Settlement and for Attorneys' Fees, Expenses and Incentive Award. In preparation for the Hearing, Meijer filed, on August 1, 2006, additional Memoranda in support of these Motions as well as a second Declaration by Attorney Small ("Small Declaration II") and an Affidavit from Thomas R. Glenn, Senior Vice President and Chief Operating Officer of Complete Claims Solutions, Inc. ("CCS"), the firm hired to act as Settlement Administrator. These submissions provided the Court with the following updated information regarding the Settlement Class and Fund: approximately sixty-eight[4] identified Class Members had responded to the Notice which had been

---

[3]The term "Plaintiffs' Counsel" refers collectively to Class Counsel, as identified above, and the firm Trujillo, Rodriguez, and Richards, L.L.C. ("TRR"), which has served as local counsel for Plaintiffs.

[4]Sixty-eight refers to the number of clearly non-duplicative responses that CCS had received from identified Class Members as of August 1, 2006. CCS received a total of seventy-two responses from identified Class Members, but four were identified as potentially duplicative. (Glenn Aff. ¶ 13.) CCS also received thirty requests for inclusion in the Settlement Class from entities believing that they may be Class Members; of those requests, two entities were identified as additional Class Members, sent Notice, and given the opportunity to respond and become eligible to receive allocation from the Settlement Fund. (Id. ¶ 14.) As of the Final Approval Hearing on August 8, 2006, no response from those entities had been received; their responses, however, did not need to be postmarked until August 7, 2006 (Id.), and thus may have been validly outstanding at the time of

mailed to them and were therefore eligible to receive allocation from the Settlement Fund (Thomas R. Glenn Aff. ¶ 13), no objections or Notices of Appearance had been filed, and only one Settlement Class Member - Costco Wholesale Corporation ("Costco") - had requested exclusion from the Class. (Id. ¶ 15.)   After factoring in accrued interest and the appropriate reversion to 3M to account for Costco's exclusion, the Settlement Fund totaled $27,783,836.97 as of August 1, 2006.   (Mem. in Further Support of Pls.' Mot. for Final Approval of Settlement at 5 n.6.).   Meijer's submissions also indicated that Plaintiffs' Counsel would request an award of $7.5 million in attorneys' fees and a reimbursement of $390,452.46 in expenses, and that Meijer would request an incentive award of $25,000.   The Court confirmed these facts at the Hearing and then considered the final certification of the Settlement Class, the final approval of the proposed Settlement, and the final approval of the requested attorneys' fees, expenses, and incentive award.

## II.   FINAL CLASS CERTIFICATION

"The Third Circuit has declared that class actions created for the purpose of settlement are recognized under the general scheme of Federal Rule of Civil Procedure 23, provided that the class meets the certification requirements under the Rule." Pozzi v. Smith, 952 F. Supp. 218, 221 (E.D. Pa. 1997) (citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 792-97 (3d Cir. 1995)).   The Settlement Class was preliminarily certified on March 28, 2006; the Class, however, may not be finally certified for settlement purposes unless it fully satisfies the requirements laid out in Federal Rule of Civil Procedure 23(a) and (b).   See In re Cmty. Bank of N. Va., 418 F.3d 277, 299 (3d Cir. 2005) (noting that "the ultimate inquiry into the fairness of the settlement under Fed. R. Civ. P. 23(e) does not relieve the court of its responsibility to evaluate Rule

the Hearing.   For greater detail regarding the Notice Plan, see infra Section III.A.

23(a) and (b) considerations"). In the settlement context, the requirements of Rule 23(a) and (b) call for heightened judicial scrutiny. See, e.g., In re General Motors, 55 F.3d at 784; Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 621 (1997) (stating that the full satisfaction of Fed. R. Civ. P. 23(a) and (b) criteria as a prerequisite to certification is even more important when the case is to be settled without trial). The United States Court of Appeals for the Third Circuit ("Third Circuit") has summarized the legal standard for class certification as follows:

> To be certified, a class must satisfy the four threshold requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). In addition to the threshold requirements of Rule 23(a), parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Rule 23(b)(3) . . . provides for so-called "opt-out" class actions [sic] suits. Under Rule 23(b)(3), two additional requirements must be met in order for a class to be certified: (1) common questions must "predominate over any questions affecting only individual members" (the "predominance requirement"), and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy" (the "superiority requirement").

In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004) (internal citations omitted).

For the reasons given below, the Court finds that the proposed Settlement Class satisfies the requirements of Rule 23(a) and (b)(3), and thus the Court certifies the Class for settlement purposes.

A.      Rule 23(a) Factors

     1.      Numerosity

When determining whether a proposed class is sufficiently large such that joinder of all

members of the class is impractical, the Third Circuit has noted that "[n]o minimum number of plaintiffs is required . . . , but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds forty, the first prong of Rule 23(a) has been met."  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice § 23.22[3][a] (Matthew Bender 3d ed. 1999)).  In addition to evaluating the absolute size of the proposed class, courts may consider other characteristics of the class when assessing numerosity, such as the geographic dispersion of class members.  5 Moore's Federal Practice § 23.22[1][d] (Matthew Bender 3d ed. 2006); see also In re Corel Corp. Inc. Sec. Litig., 206 F.R.D. 533, 540 (E.D. Pa. 2002) (noting that plaintiffs' argument that "joinder is impracticable due to the geographic dispersion of class members" supports a finding of numerosity).  Here, information supplied from 3M's sales records indicates that the Settlement Class consists of at least 143 Members, who are headquartered in at least 35 different states.  (Thomas R. Glenn Aff. ¶ 5; Leffler Decl. Table 1.) Accordingly, the Court finds that the Settlement Class satisfies the numerosity requirement of Rule 23(a).

2.   Commonality

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.  Because the requirement may be satisfied by a single common issue, it is easily met. . . ."  Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994) (citations omitted).  The Court notes that the "numerous common questions of law and fact" that this Court found to be present in Bradburn are also present in this case.  See Bradburn, 2004 WL 1842987, at *3.  Namely, all members of the Settlement Class must establish:  the proper definition of the relevant product and geographic market; whether 3M has monopoly power in the

relevant market; whether 3M acquired monopoly power through anti-competitive activity; and whether 3M's anti-competitive conduct caused tape prices to be artificially inflated. As Meijer shares multiple questions of law and fact with the proposed Class, the Court finds that Rule 23(a)'s commonality requirement is satisfied.

3.    Typicality

"The concepts of commonality and typicality are broadly defined and tend to merge." Baby Neal, 43 F.3d at 56. "'[A] plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other Class members and is based on the same legal theory.'" T.B. v. School Dist. of Phila., Civ. A. No. 97-5453, 1997 WL 786448, at *4 (E.D. Pa. Dec. 1, 1997) (quoting Paskel v. Heckler, 99 F.R.D. 80, 83 (E.D. Pa. 1983)) (alteration in original). The named plaintiffs' claims need only be sufficiently similar to those of the class such that "the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 631 (3d Cir. 1996), aff'd sub nom. Amchem Prods., 521 U.S. 591. Here, Meijer's claims are typical of the claims of the members of the proposed Class. Both Meijer and all Settlement Class Members allegedly have been injured by the same anti-competitive conduct of 3M, and purportedly suffered overcharges as a result. Accordingly, the Court finds that the typicality requirement is satisfied.

4.    Adequacy of representation

"The adequacy of the class representative is dependant on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class." In Re Linerboard Antitrust Litig., 203 F.R.D. 197, 207 (E.D. Pa. 2001) (citations omitted). With respect to the first factor, Class Counsel

have submitted firm resumes (Small Decl. ¶¶ 62-64, Exs. 8, 9A, 10A) which attest to their extensive experience in antitrust and other class action litigation and their successful prosecution of such cases in courts throughout the country.  The Court, therefore, finds that Class Counsel is competent to conduct this class action.

The second factor that must be considered when evaluating adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent."  Amchem Prods., 521 U.S. at 625.  For this factor to be satisfied, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the Class members."  E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977) (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)); see also Georgine, 83 F.3d at 630 (finding class representative inadequate because the proposed settlement made "important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others").  Consequently, the adequacy of representation requirement is not satisfied where "the named representative's interest in maximizing its own recovery provides a strong incentive to minimize the recovery of other class members."  Yeager's Fuel, Inc. v. Pa. Power & Light Co., 162 F.R.D. 471, 478 (E.D. Pa. 1995).

Meijer is capable of providing adequate representation for the absent Class Members. Meijer, as a purchaser of both brand and private label tape from 3M, has the same interest in this antitrust claim as the absent Class Members do: namely, to challenge and obtain damages for 3M's anti-competitive conduct.  The potential concern regarding the adequacy of Meijer's representation is Meijer's decision to seek these damages under an "overcharge" theory as opposed to an alternate "lost profits" theory.  See Bradburn Parent/Teacher Store, Inc. V. 3M, Civ. A. No. 02-7676, 2004

WL 414047, at *4 (E.D. Pa. Mar. 1, 2004). Rule 23(a)(4), however, asks the Court to examine the interests of the class representative, not its litigation decisions. Meijer's decision to pursue the common interest of the proposed Class through one theory of recovery as opposed to another does not compromise the adequacy of Meijer's representation unless the record demonstrates that such a decision will work to the detriment of absent Class Members. See Bradburn, 2004 WL 1842987, at *6 (rejecting the argument that "the mere risk that the theory [of damages] proposed by Plaintiff will be less well received than a competing theory which could be put forward by other potential class members is sufficient for the Court to find the existence of an imminent and apparent potential conflict").

While the lost profits theory is a means of pursuing damages available to the Settlement Class, Meijer's decision to pursue an overcharge theory is not antagonistic to the interests of the Class. Meijer has submitted a declaration from Keith Leffler, Ph.D., an Associate Professor at the University of Washington, which indicates that it is highly likely that every Class Member's overcharge remedy is larger than its lost profits remedy and, even if a Class Member has a larger lost profits claim, the burden and difficulty of proving such a claim would overwhelm its additional value. (Leffler Decl. ¶ 6.) The Court also finds it significant that, in the years since the LePage's verdict, no potential member of the proposed Meijer Class pursued a lost profits claim and Kmart, the one such entity to file an individual action, chose to pursue an overcharge remedy rather than a lost profits remedy. Complaint at ¶ 4, Kmart Corp. v. 3M Co., Civ. A. No. 05-3842 (E.D. Pa. July 25, 2005). Thus, since Class Counsel is competent to conduct a class action, and since Meijer does not have interests in this action that are antagonistic to the interests of the Members of the proposed Settlement Class, the Court finds that Meijer satisfies the adequacy of representation requirement.

B.     Rule 23(b)(3) Factors

1.     Predominance

Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandates that it is far more demanding than the Rule 23(a)(2) commonality requirement." In re LifeUSA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001) (citing Amchem, 521 U.S. at 623-24). The difficulty of demonstrating sufficient class cohesion naturally varies depending on the nature of the claim, but "'[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws.'" In re Warfarin, 391 F.3d at 528 (quoting Amchem, 521 U.S. at 625).

The Court finds that common questions of law and fact predominate in this case. The substance of this antitrust claim derives from the anti-competitive conduct of 3M and "does not depend on the conduct of individual class members." Id. The success of the claim hinges on matters of common, class-wide proof; the evidence that proves the violation as to one Class Member proves it as to all Class Members. See In re Linerboard, 203 F.R.D. at 220 (finding predominance requirement satisfied where "[p]laintiffs have shown that they plan to prove common impact by introducing generalized evidence which will not vary among individual class members."). "Finally, the fact that plaintiffs allege purely an economic injury . . . and not any physical injury, further supports a finding of commonality and predominance because there are little or no individual proof problems in this case otherwise commonly associated with physical injury claims." In re Warfarin, 391 F.3d at 529. Accordingly, the Court finds that Rule 23(b)(3)'s predominance requirement is

met.

> ### 2.   Superiority

"The superiority requirement [of Rule 23(b)(3)] 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" In re Warfarin, 391 F.3d at 533-34 (quoting In re Prudential Ins. Co. of Am. Sales Practice Litig., 148 F.3d 283, 316 (3d Cir. 1998)).  The considerations relevant to this determination are:

> (A) the interest of members of the class in individually controlling the prosecution and defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum . . . .[5]

Fed. R. Civ. P. 23(b)(3).

Here, a class action is superior to other methods of adjudication.  There appears to be little interest on behalf of the Members of the proposed Class in litigating their claims individually. Roughly half of the Members of the proposed the Class have under $1 million in total tape purchases from 3M (Leffler Decl. Table 1), and the potential recovery of these Class Members would be just a fraction of that amount - a sum easily subsumed by the various fees and expenses of a complex antitrust suit against a large corporate defendant such as 3M.  See In re Warfarin, 391 F.3d at 534; see also Orloff v. Syndicated Office Sys., Inc., Civ. A. No. 00-5355, 2004 WL 870691, at *5 (E.D.

---

[5]There is also a fourth consideration: "(D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D).  The Court, however, need not consider this final factor in the context of a settlement-only class certification.  See Amchem, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

Pa. Apr. 22, 2004) (finding a class action to be the superior method of adjudication, "because it "provides an efficient alternative to individual claims, and because individual Class members are unlikely to bring individual actions given the likelihood that their litigation expenses would exceed any potential recovery").  The presence of some larger purchasers in the proposed Class who potentially could support an individual suit does not militate against the superiority of the class action, given the presence and number of smaller claimants.  See Bradburn, 2004 WL 1842987, at *18 (finding the superiority requirement to be satisfied even though the "class may include members who have purchased a sufficiently large quantity of tape from 3M to justify the commencement of an individual suit" because "the class also contains many members whose potential damage awards would be dwarfed by their potential litigation expenses.").  If these larger purchasers preferred to litigate separately, they could have opted out of the proposed Settlement.  The fact that, of the potential members of the proposed Meijer Class, only Kmart chose to bring an individual action speaks both to the lack of interest of the Members of the proposed Class in litigating separately and to the lack of "litigation concerning the controversy already commenced by or against members of the class."  Fed. R. Civ. P. 23(b)(3); see also In re Warfarin, 391 F.3d at 534 ("[T]here were a relatively small number of individual lawsuits pending against [the defendant] in this matter, which indicated . . . that there was a lack of interest in individual prosecution of claims.").  Lastly, the consolidation of these claims before the Court is appropriate given the Court's experience and familiarity with the previous litigation, LePage's, that arose from the conduct of 3M at issue here. Accordingly, the Court finds that a class action is the superior method of adjudication in this case, as required by Rule 23(b)(3).

　　　　Thus, the Court concludes that the proposed Settlement Class satisfies all of the relevant

requirements of Rule 23(a) and (b) and, therefore, approves final certification of the Class for the purposes of settlement.

III.    MOTION FOR FINAL APPROVAL OF SETTLEMENT

        "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).  "While the law generally favors settlement in complex or class action cases for its conservation of judicial resources, the court has an obligation to ensure that any settlement reached protects the interests of the class members." In re Aetna Inc. Sec. Litig., MDL No. 1219, 2001 WL 20928, at *4 (E.D. Pa. Jan. 4, 2001) (citing In re General Motors, 55 F.3d at 784).  Consequently, prior to approving a settlement, the Court must determine whether the notice provided to class members was adequate. Id. (citations omitted).  The Court must also "scrutinize the terms of the settlement to ensure that it is 'fair, adequate and reasonable.'" Id. (quoting In re General Motors, 55 F.3d at 785).  "[C]ases such as this, where the parties simultaneously seek certification and settlement approval, require 'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." In re Prudential, 148 F.3d at 317 (quoting In re General Motors, 55 F.3d at 805).

        A.    Adequacy of Notice

        The due process demands of the Fifth Amendment and the Federal Rules of Civil Procedure require adequate notice to class members of a proposed settlement.  In re Aetna, 2001 WL 20928, at *5.  "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." In re Prudential, 148 F.3d at 306 (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985)).

The due process requirements of the Fifth Amendment are satisfied by the "combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class." Id. The notice must be "'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Lachance v. Harrington, 965 F. Supp. 630, 636 (E.D. Pa.1997) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

Moreover, "in a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e)." In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig., 226 F.R.D. 498, 517 (E.D. Pa. 2005) (citing Carlough v. Amchem Prods., Inc., 158 F.R.D. 314, 324-25 (E.D. Pa.1993)).  Rule 23(c)(2) provides that class members must receive the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) also requires that "the notice indicate an opportunity to opt out, that the judgment will bind all class members who do not opt out and that any member who does not opt out may appear through counsel."  In re Diet Drugs, 226 F.R.D. at 517 (citing Fed. R. Civ. P. 23(c)(2)).

In addition to the requirements of Rule 23(c)(2), Rule 23(e) "requires that notice of a proposed settlement must inform class members:  (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing." Id. at 517-18 (citation omitted).  The court should consider both "the mode of dissemination and its content to assess whether notice was sufficient." Id.  Although the "notice need not be unduly specific . . . the notice

18

document must describe, in detail, the nature of the proposed settlement, the circumstances justifying it, and the consequences of accepting and opting out of it." Id. at 518 (citing In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig., 369 F.3d 293, 308-10 (3d Cir. 2004)).

The Court finds that the Notice provided in this case satisfies the requirements of due process and the Federal Rules of Civil Procedure. Pursuant to the Settlement Agreement and the Court's Preliminary Approval Order, Meijer hired CCS as Settlement Administrator to oversee the dissemination of Notice to the Class. (Small Decl. II ¶ 3.) Potential Members of the Settlement Class were identified by Meijer and 3M through the examination of 3M's sales data as well as the list of entities compiled in the Bradburn litigation. (Small Decl. ¶ 52.) Between May 1 and May 5, 2006, CCS sent Notice by first-class mail to the 143 entities identified as those believed to be Members of the Settlement Class. (Small Decl. ¶ 52; Glenn Aff. ¶ 5.) This Notice was accompanied by a preprinted Proof of Claim form, which provided the total invoice amount paid to 3M by the Settlement Class Member for invisible transparent tape for home or office use, less any applicable volume rebates, from 1999 through 2004. (Small Decl. ¶ 53.) An attachment to the preprinted form listed this information on a year-by-year and SKU-by-SKU basis. (Id.) Settlement Class Members were given the opportunity either to agree with the total purchase amount stated on the Proof of Claim form, or to disagree and provide supporting documentation for a different amount. (Id.) On or about April 27, 2006, CCS sent Summary Notice by first-class mail to over 3000 other entities identified by 3M as having purchased invisible or transparent tape directly from 3M, based on the list used in the Bradburn litigation. (Small Decl. ¶ 52; Glenn Aff. ¶ 4.) Each entity receiving Summary Notice also received a Claim Form Request, with which it could request a Proof of Claim

19

Form if it believed it was a Member of the Settlement Class.  (Small Decl. ¶ 54.)  Additionally, an abbreviated Summary Notice was published on May 11, 2006, in <u>DSN Retailing Today</u>, <u>Supermarket News</u>, and <u>Office Products International</u>.  (Glenn Aff. ¶ 6.)  Lastly, Notice was posted on a dedicated website, www.TransparentTapeDirectPurchaserSettlement.com; this website has been active since May 1, 2006.  (Small Decl. ¶ 52; Glenn Aff. ¶ 12.)  The Court finds that these efforts to disseminate notice were the best practicable.  <u>See</u> <u>Zimmer Paper Prods., Inc. v. Berger & Montague</u>, 758 F.2d 86, 90 (3d Cir. 1985) (noting that "in the usual situation first-class mail and publication in press fully satisfy the notice requirements of both Fed. R. Civ. P. 23 and the due process clause").

The Court also finds the content of the Notice and the Summary Notices to be adequate under the due process clause and Rules 23.  The Notice describes the nature and background of this action and defines the Class, Class claims, and consequences of Class Membership.  (Glenn Aff. Ex. 2.)  It summarizes the terms of the Settlement, including information relating to the size of the Settlement Fund; the release provisions of the Settlement; and the attorneys' fees, expenses, and incentive award for which Meijer may apply.  (<u>Id.</u>)  The Notice also describes the proposed Distribution Plan and details how to submit a proper and timely Proof of Claim form, advising Class Members that, if they fail to submit a proper Proof of Claim form by the specified deadline, they may be barred from any recovery though still bound by the final disposition of the litigation.  (<u>Id.</u> at 3-4.)  The Notice alerts Class Members to their right to request exclusion from the Class, and details the procedure for and consequences of doing so.  (<u>Id.</u> at 3.)  The Notice informs Class Members of the time and date of the Final Approval Hearing, advising them of the nature and purpose of the Hearing, of their rights to object to the Settlement and appear at the Hearing, and of the procedure for asserting those rights.  (<u>Id.</u> at 4.)  The Notice includes the contact information of the relevant

attorneys and of the Settlement Administrator, and also directs Class Members to the dedicated website, where copies of the Notice, the Settlement Agreement, and other documents pertaining to the case may be found.  (Id.)  The Summary Notices provide the essential information regarding the Class, the litigation, the terms of the Settlement, and the Final Approval Hearing.  (Glenn Aff. Exs. 1, 4.)  The Summary Notices inform potential Class Members of their rights with regard to the Settlement and provide information on how copies of the full Notice and Settlement Agreement may be obtained.  (Id.)  The Summary Notice distributed by mail also explicitly distinguishes the proposed Meijer Class from the Bradburn Class and details both the procedure for submitting the Claim Form Request and the consequences of failing to submit a Proof of Claim form.  (Glenn Aff. Ex. 1.)  After reviewing the Notice and Summary Notices, the Court concludes that their substance, like the method of their dissemination, is sufficient to satisfy the concerns of due process and Rule 23.  See In re Prudential, 148 F.3d at 328; In re Aetna, 2001 WL 20928, at *5 (citing In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 175 (E.D. Pa. 2000)).

 B. Presumption of Fairness

  Rule 23(e) of the Federal Rules of Civil Procedure requires that the Court must approve any settlement of a class action and states that the Court may only approve a settlement "after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1).  The Third Circuit has determined that a court should accord a presumption of fairness to settlements if the court finds that:  "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  In re Cendant Corp. Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001) (citing In re General Motors, 55 F.3d at 785).

The Settlement in this case is entitled to a presumption of fairness.  The Settlement Agreement resulted from arm's-length negotiations that occurred both during the Court-suggested mediation and in the months following.  (Small Decl. ¶¶ 36, 40.)  Prior to the mediation, the parties exchanged detailed mediation statements so that discussions could be founded on the attorneys' full understanding of the strengths and weaknesses of their cases.  (Id. ¶¶ 34-35.)  The Settlement was reached after a year of litigation and discovery, during which the parties also had access to the LePage's trial record and the Court's ruling on collateral estoppel in Bradburn.  See Bradburn Parent/Teacher Store, Inc. v. 3M, Civ A. No. 02-7676, 2005 WL 1388929 (E.D. Pa. June 9, 2005).[6] (Id. ¶¶ 18, 26.)  Meijer engaged in coordinated discovery with the parties in the Bradburn, Publix, and Kmart actions, which entailed the compilation and review of hundreds of thousands of pages of documents and participation in multiple depositions.  (Id. ¶¶ 18-25, 28.)  As already discussed, Class Counsel has extensive experience litigating antitrust class actions such as the one at hand.  Lastly, no Class Members filed objections to the Settlement.  Accordingly, the Court will apply a presumption of fairness in analyzing the Settlement.

---

[6]Based on the outcome of the LePage's litigation, the Court held that collateral estoppel applied to establish the following facts upon the trial of the Bradburn action:

> 1. For the time period from June 11, 1993 [to] October 13, 1999, the relevant market in this matter is the market for invisible and transparent tape for home and office use in the United States;
> 2. For some period of time between June 11, 1993 and October 13, 1999, 3M possessed monopoly power in the relevant market, including the power to control prices and exclude competition in the relevant market;
> 3. For some period of time between June 11, 1993 and October 13, 1999, 3M willfully maintained such monopoly power by predatory or exclusionary conduct; and
> 4. For some period of time between June 11, 1993 and October 13, 1999, 3M's predatory or exclusionary conduct harmed competition.

Bradburn, 2005 WL 1388929, at *7.

C.     The *Girsh* Factors

The Third Circuit developed a nine-factor test in Girsh, "which provides the analytic structure

for determining whether a class action settlement is fair, reasonable, and adequate under Rule 23(e)."

In re Cendant, 264 F.3d at 231 (citation omitted).  The nine factors are:

> (1) The complexity, expense, and likely duration of the litigation; (2)
> the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class action through the trial; (7) the ability
> of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund
> in light of all the attendant risks of litigation.

Id. at 232 (citing Girsh, 521 F.2d at 157).  Upon consideration of these factors, the Court finds that

the proposed Settlement is fair, reasonable, and adequate.[7]

1.     Complexity, expense, and likely duration of the litigation

"This factor captures 'the probable costs, in both time and money, of continued litigation.'"

Id. at 233 (citing In re General Motors, 55 F.3d at 812).  An antitrust class action, such as this one,

is "arguably the most complex action to prosecute" as "[t]he legal and factual issues involved are

always numerous and uncertain in outcome." In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568,

---

[7]As the Third Circuit has recently noted, "The Girsh factors do not provide an exhaustive list of factors to be considered when reviewing a proposed settlement." In re AT&T Corp. Sec. Litig., Civ. A. Nos. 05-2727, 05-2728, – F.3d –, 2006 WL 2021033, at *3 (3d Cir. July 20, 2006).  In In re Prudential, for instance, the Third Circuit enumerated a list of additional considerations which may be relevant to a court's assessment of the fairness of a class action settlement.  148 F.3d at 323. After thorough review of the proposed Settlement in this case, the Court has found that all considerations relevant to its assessment of the Settlement's fairness are fully covered by the Court's analysis of the adequacy of the Notice, the nine Girsh factors, and the fairness of the Distribution Plan.

23

577 (E.D. Pa. 2003) (citations and internal quotation marks omitted).

In the absence of settlement, significant costs in terms of both time and money likely would result from the continued litigation of this case. At the time when the MOU and the subsequent Settlement Agreement were reached, the issue of class certification was still pending, and other legal issues, including the potential tolling of the statute of limitations and the proper preclusive effect of the LePage's verdict, were going to be disputed. The parties had begun coordinated discovery at that point, but substantial merits discovery remained. In addition to discovery costs, continued litigation potentially would have entailed various dispositive motions, the procurement and submission of additional expert reports, and a substantial trial. Whatever the disposition of the case, litigation likely would have continued for some time thereafter through post-trial motions and appeal. See In re Ikon, 194 F.R.D. at 179 ("[T]he extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed."). The time and resources saved by the avoidance of these costs would benefit all parties. See In re Warfarin, 391 F.3d at 536 ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of recovery to the class."); In re Aetna, 2001 WL 20928, at *6 (noting that "[t]he risk of delay could have deleterious effects on any future recovery due to the time value of money"). Thus the Court finds that the complexity, expense, and likely duration of the litigation favor settlement. See In re Prudential, 148 F.3d at 318 ("[T]he trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement.").

2.      The reaction of the class

This factor "attempts to gauge whether members of the class support the settlement." Id.

As stated above, Notice of this Settlement was disseminated thoroughly by means of publication and first-class mail, and informed potential Class Members of their rights to object to the Settlement and to request exclusion from the Class. The deadline for filing objections and requesting exclusion was June 6, 2006.  As of the Final Approval Hearing on August 8, 2006, no objections and only one request for exclusion had been filed.  (Glenn Aff. ¶ 15.)  This total absence of objections, coupled with such a low opt-out rate, argues in favor of the proposed Settlement.  See, e.g., In re PNC Fin. Servs. Group, Inc., Civ. A. No. 02-271, 2006 WL 1984660, at *9 (W.D. Pa. July 13, 2006) ("Here, no class member objected to the proposed settlement.  Similarly, only five opt outs were received after the mailing of over 73,000 copies of the notice and the publication of the summary notice. Under these circumstances an inference of strong class support is properly drawn."); Marino v. UDR, Civ. A. No. 05-2268, 2006 WL 1687026, at *3 (E.D. Pa. June 14, 2006) ("The fact that there are no opt-outs and no objections favors the proposed settlement.") (citing Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118-119 (3d Cir. 1990)); Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 115 (E.D. Pa. 2005) (holding that, when only 70 out of 90,000 potential class members opted out and "not a single class member objected to the proposed settlement . . . [s]uch a response (or lack thereof) weighs greatly in favor of approving the settlement") (citing cases).  The lack of objections and low opt-out rate are particularly notable in this case as "these are sophisticated businesses with, in some cases, large potential claims, and they could be expected to object to a settlement they perceived as unfair or inadequate."  In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 254-55 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004).

Additionally, as of August 1, 2006, approximately sixty-eight Settlement Class Members had submitted Proof of Claim forms qualifying them to participate in the proposed Settlement.  (Glenn

Aff. ¶ 13).  These claimants amount to nearly half of the 143 entities to whom Notice originally was mailed and over 60% of the tape purchases by Settlement Class Members from 3M during the relevant period.  (Id.)  This response further indicates the fairness of the proposed Settlement.  See In re Auto. Refinishing Paint Antitrust Litig., MDL No. 1426, 2004 U.S. Dist. LEXIS 29161, at *15 (E.D. Pa. Sept. 27, 2004) ("The fact that there have been no objectors to the Settlement, that the claims filed represent a significant majority of the sales at issue, and that claims have been filed by major companies with significant resources . . . supports approval of the settlement."); Stoner v. CBA Info. Servs., 352 F. Supp. 2d 549, 552 (E.D. Pa. 2005) ("Over 16% of 11,980 class members notified have submitted claim forms seeking to participate in the settlement.  Only 18 members have chosen to opt out and only five have filed . . . objections to the proposed settlement.  This relatively high response rate indicates a more than favorable class reaction.") (footnote and citations omitted). Accordingly, the Court finds that the reaction of the Class in this case strongly favors approval of the Settlement.

3.    <u>Stage of proceedings and amount of discovery completed</u>

This factor enables the Court to "'determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'"  In re Cendant, 264 F.3d at 235 (quoting In re General Motors, 55 F.3d at 813).  In this case, a substantial amount of discovery had been performed before the Settlement was reached:  Class Counsel had compiled and undertaken review of  hundreds of thousands of pages of discovery documents and depositions, had  reviewed the discovery and trial record from the LePage's litigation, had participated in coordinated discovery in the Bradburn litigation, and had consulted extensively with an economic expert.  Moreover, prior to reaching the Settlement, the parties had engaged in mediation, including the exchange of mediation statements

regarding the merits of their respective positions in order to inform and facilitate their negotiations. The Court concludes, therefore, that the parties had "an adequate appreciation of the merits" of this case at the time they negotiated the Settlement.  In re Cendant, 264 F.3d at 235 (citation omitted).

      4.     Risks of establishing liability

This factor enables the Court to examine "'what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them.'" In re Cendant, 264 F.3d at 237 (quoting In re General Motors, 55 F.3d at 814).  "When considering this factor, the court should avoid conducting a mini-trial.  Rather the court may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'"  In re Aetna, 2001 WL 20928, at *9 (quoting In re Ikon, 194 F.R.D. at 181).

In order to succeed on its claim that 3M violated § 2 of the Sherman Act, Meijer "must establish that [3M] possessed monopoly power in the [relevant] market and that it willfully acquired or maintained that power as distinguished from achieving growth or development as a consequence of a superior product, business acumen, or historic accident."  In re Warfarin, 391 F.3d at 529 n.11 (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).  Meijer's risks of establishing liability in this case are diminished by the LePage's verdict and the collateral estoppel ruling in Bradburn.  Meijer, however, faced numerous challenges in establishing 3M's liability in this case. For instance, the rebates offered by 3M after 1999[8] may not have been anti-competitive and the verdict in favor of LePage's does not mean that purchasers of tape from 3M were necessarily injured

---

       [8]The collateral estoppel ruling in Bradburn only covers the Class Period up until October 13, 1999.  Bradburn, 2005 WL 138892, at *7.

as well, since many of them  may have benefitted from the challenged rebates.  The Court concludes that, given these challenges, this factor favors settlement.

        5.    <u>Risks of establishing damages</u>

"Like the fourth factor, 'this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time.'"  <u>In re Cendant</u>, 264 F.3d at 238-39 (quoting <u>In re General Motors</u>, 55 F.3d at 816).  In making this inquiry, the Court considers the "potential damage award if the case were taken to trial against the benefits of immediate settlement."  <u>In re Warfarin</u>, 212 F.R.D. at 256 (citing <u>In re Prudential</u>, 148 F.3d at 319).  Meijer had not completed a final damages calculation prior to reaching the Settlement Agreement with 3M against which the Settlement Amount may be compared.  The Settlement Class, however, would face significant risks in establishing damages at trial.  For instance, to the extent that some Class Members may have benefitted from the challenged rebates, they would have had to prove that a period of recoupment followed the discontinuation of the rebates.  <u>See generally</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 588-89 (1986).  Some evidence, however, suggests that such a recoupment period never occurred and that, even if such recoupment were established, the resulting damages period potentially would have been fairly short.  (Leffler Decl. II ¶¶ 4, 8-13.)  Additionally, the parties' efforts to dispute damages at trial undoubtedly would result in a "'battle of the experts,' with each side presenting its figures to the jury and with no guarantee whom the jury would believe." <u>In re Cendant</u>, 264 F.3d at 239.  For these reasons, the Court concludes that the risks of establishing damages weigh in favor of settlement in this case.

        6.    <u>Risks of maintaining class action status through trial</u>

This factor allows the Court to weigh the possibility that, if a class were certified for trial in

this case, it would be decertified prior to trial. Federal Rule of Civil Procedure 23(a) provides that "a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable, and proceeding to trial would always entail the risk, even if slight, of decertification." In re Cendant, 264 F.3d at 239 (citation and internal quotations omitted). The Settlement here was reached before the Court had ruled on class certification, a motion which 3M had contested. Thus, there was the risk that such certification would not be granted in the first place, along with the ever-present risk that the class, if certified, would have been decertified later in the litigation. Accordingly, the Court finds that this factor favors settlement. See In re Prudential, 148 F.3d at 321 ("There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement.")

7.   Ability of defendants to withstand greater judgment

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." In re Cendant, 264 F.3d at 240. The Court notes that 3M, with 2005 annual net sales of $21.2 billion (3M 2005 Annual Report), likely can withstand a judgment significantly greater than the Settlement Amount. Even so, this determination in itself does not carry much weight in evaluating the fairness of the Settlement. See Perry, 229 F.R.D. at 116 ("Fleet could certainly withstand a much larger judgment as it has considerable assets. While that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages."). Accordingly, the Court finds that this factor disfavors settlement, albeit very slightly.

8 & 9.   Range of reasonableness (in light of best possible recovery and risks of litigation)

29

The eight and ninth <u>Girsh</u> factors "ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." <u>In re Aetna</u>, 2001 WL 20928, at *11 (citing <u>In re Prudential</u>, 148 F.3d at 322). In making this assessment, the Court compares "'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing'" with "'the amount of the proposed settlement.'" <u>In re General Motors</u>, 55 F.3d at 806 (quoting MCL 2d § 30.44). The damages estimates should "generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside." <u>Id.</u> (citation omitted). "The primary touchstone of this inquiry is the economic valuation of the proposed settlement." <u>Id.</u> "In making this assessment, the evaluating court must recognize that "settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and guard against demanding too large a settlement based on the court's own view of the merits of the litigation." <u>In re Aetna</u>, 2001 WL 20928, at *11 (citing <u>In re General Motors</u>, 55 F.3d at 806).

Pursuant to the Settlement Agreement, Settlement Class Members will receive immediate monetary relief in accordance with their relevant purchases of 3M tape, without undertaking the risks, costs, and delays of further litigation. The Settlement Fund equals approximately 2% of the amount paid to 3M by Members of the Settlement Class for invisible and transparent tape for home or office use during the period from October 2, 1998 to February 10, 2006. Kmart - the one potential member of the proposed <u>Meijer</u> Class that brought an individual suit against 3M - and Publix both settled their claims against 3M for that percentage of their relevant purchases. This percentage also falls "within a range of settlements reached in other antitrust class actions" in this District. <u>In re Auto. Refinishing</u>

Paint Antitrust Litig., MDL No. 1426, 2004 WL 1068807, at *2 (preliminarily approving a settlement which represented approximately 2% of sales during the class period); see also In re Linerboard Antitrust Litig., 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (approving a settlement that represents 1.62% of sales from class period); In re Plastic Tableware Antitrust Litig., Civ. A. No. 94-3564, 1995 WL 678663, at *1 (E.D. Pa. Nov. 13, 1995) (3.5% of sales); Fischer Bros. v. Mueller Brass Co., 630 F. Supp. 493, 499 (E.D. Pa. 1985) (0.2% of sales); Axelrod v. Saks & Co., Civ. A. Nos. 76-3805, 76-4011, 77-172, 1981 WL 2031, at *1 (E.D. Pa. Feb. 23, 1981) (3.7% of sales)).  Moreover, there is no indication that this Settlement Amount has been reached inappropriately, or should otherwise be considered suspect; both parties have demonstrated willingness and ability to litigate this action, have engaged in mediation at the Court's suggestion, and have reached an agreement that provides Class Members with monetary relief that is immediate, significant, and in line with other comparable settlements.  See In re Aetna, 2001 WL 20928, at *11 ("Additionally, the hallmarks of a questionable settlement are absent.  Plaintiffs will receive a significant monetary settlement, and there is no suggestion of collusion between Defendants and Plaintiffs' counsel.") (internal quotation marks omitted).  Accordingly, the Court finds that the Settlement represents a reasonable compromise in light of both the best possible recovery and the risks of litigation.

Thus, of the nine Girsh factors, the Court finds that only one - Defendant's ability to withstand greater judgment - does not favor the proposed Settlement.  This one factor is outweighed by the other Girsh factors favoring the Settlement.  The Court, therefore, concludes that the Settlement Agreement is fair, adequate, and reasonable.

D.      Fairness of the Distribution Plan

In addition to analyzing the terms of the Settlement Agreement, the Court must also examine

31

the fairness of the proposed Distribution Plan. "'Approval of a plan of allocation of a settlement fund

in a class action is governed by the same standards of review applicable to approval of the settlement

as a whole: the distribution plan must be fair, reasonable and adequate.'" In re Ikon, 194 F.R.D. at

184 (quoting In re Computron Software Inc., 6 F. Supp. 2d 313, 321 (D.N.J. 1998)). "Courts

generally consider plans of allocation that reimburse class members based on the type and extent of

their injuries to be reasonable." In re Aetna, 2001 WL 20928, at *12 (citing In re Ikon, 194 F.R.D.

at 184).

     The proposed Distribution Plan allocates the Settlement Fund among Class Members who

submit proof of their claims in proportion to each claimant's relevant, direct purchases from 3M. As

detailed above, each Class Member may submit a preprinted Proof of Claim form which specifies that

particular Member's purchase amount. When submitting this form, the Class Member can either

agree with the total purchase amount stated in the form or disagree and provide supporting

documentation for a different amount. These Proof of Claim forms must have been postmarked by

July 11, 2006, for those Class Members who received them initially by mail, and by August 7, 2006,

for those who received their forms in response to a Claim Form Request. Once the Settlement

Administrator has received and reviewed all of the forms and has calculated each Class Member's

recovery, Plaintiffs will return to the Court to seek approval for the distribution of the Settlement

Fund. The Court finds that the amount of a Class Member's relevant, direct purchases provides a

reasonable measure of the relative injury which each Class Member has suffered, and that the

submission procedure for the Proof of Claim forms affords each Class Member an opportunity to

attest to the extent of its own injury and, in turn, deserved allocation. Thus, the Distribution Plan

correlates to the damages that each participating Class Member actually suffered, and the Court finds

this Plan to be fair, reasonable and adequate.

In sum, the Court finds that the content and dissemination of Notice in this case satisfies the requirements of due process and the Federal Rules of Civil Procedure, and also finds that the Settlement Agreement is fair, adequate and reasonable in light of all relevant considerations. The Court therefore grants final approval to the Settlement. The Court further finds that the proposed Distribution Plan is fair, reasonable and adequate, and approves the Plan.

IV.     MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD

Plaintiffs' Counsel have asked the Court to award attorneys' fees amounting to the smaller of $7.5 million or one-third of the amount remaining in the Settlement Fund after refunding any reversion to 3M. As mentioned above, one Settlement Class Member, Costco, has requested exclusion. After appropriate reversion to 3M, the Settlement Amount totals $27,783,836.97. As $7.5 million is less than one-third of the Settlement Amount after reversion, Plaintiffs' Counsel seeks $7.5 million in attorneys' fees. Plaintiffs' Counsel has also requested reimbursement of litigation expenses in the amount of $390,452.46. Meijer has requested an incentive award of $25,000 as compensation for the services it provided as Class Representative. All three requests are to be paid from the Settlement Fund prior to the distribution of the Fund to eligible Members of the Settlement Class.

A.     Expenses

"Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." In re Aetna, 2001 WL 20928, at *13 (citing In re Ikon, 194 F.R.D. at 192). Plaintiffs' Counsel have requested reimbursement of litigation expenses incurred from the beginning of this litigation through August 1, 2006, totaling $390,452.46. (Small Decl. ¶¶ 70-75; Small Decl. II ¶¶ 14-20.) These expenses were incurred in connection with the

prosecution and settlement of the litigation, and include costs related to the following: travel; computerized legal research; copying; postage; telephone and fax; transcripts; retention of a mediator; the document database; expert services; and claims administration.[9] (Id.) The Court notes that the total amount of these expenses is below the maximum amount of $450,000 provided for in the Notice that was mailed to the Settlement Class, and that no objections have been filed in response to this request for reimbursement. Accordingly, the Court finds that the litigation expenses enumerated by Plaintiffs' Counsel are reasonable and grants Plaintiffs' Counsel's request for reimbursement.[10] See, e.g., In re Remeron End-Payor Antitrust Litig., Civ. A. No. 02-2007, 2005 U.S. Dist. LEXIS 27011, at *92 (D.N.J. Sept. 13, 2005) (approving reimbursement of expenses which "reflect costs expended for purposes of prosecuting this litigation, including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs; and the costs of deposition transcripts").

B.   Attorneys' Fees

"District courts approving class action settlements must thoroughly review fee petitions for fairness. Although the ultimate decision as to the proper amount of attorneys' fees rests in the sound discretion of the court, the court must set forth its reasoning clearly." In re Aetna, 2001 WL 20928,

---

[9]Pursuant to the Settlement Agreement and the Court's Preliminary Approval Order, the Settlement Administrator was paid $25,000 from the Settlement Fund on April 28, 2006 in partial payment of the costs of giving Notice to the Settlement Class; this amount is not included in Plaintiffs' Counsel's request for reimbursement. (Small Decl. ¶ 74.)

[10]The Court notes that Plaintiffs' Counsel expects to incur approximately $20,000 in additional claims administration costs prior to the distribution of the Settlement Fund. (Small Decl. II ¶ 21.) These future expenses are not included in the present request, but Plaintiffs' Counsel will seek reimbursement for them in Plaintiffs' Counsel's anticipated motion with respect to distribution of the Settlement Fund.

at *13 (citations omitted).  Thorough review of fee arrangements is critical in the context of a class action settlement because of "'the danger . . . that the lawyers might urge a class settlement at a low figure or on a less-than optimal basis in exchange for red-carpet treatment for fees,'" In re General Motors, 55 F.3d at 820 (quoting Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991)), and because the parties to the action might lack sufficient incentive to object to the arrangement.  In re AT&T Corp. Sec. Litig., Civ. A. Nos. 05-2727, 05-2728, – F.3d –, 2006 WL 2021033, at *6 (3d Cir. July 20, 2006).  "[C]ourts must be especially vigilant in searching for the possibility of collusion in pre-certification settlements" such as the one at hand.  In re General Motors, 55 F.3d at 820.

Courts typically use one of two methods for assessing attorneys' fees, either the percentage of recovery method or the lodestar method.  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005).  The Court will utilize the percentage of recovery method in this case as it is "generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'"  Id. (quoting In re Prudential, 148 F.3d at 333).  The Court, however, will use the lodestar method " to 'cross-check' the percentage fee award," as the Third Circuit recommends, in order to verify that the fee award is not excessive.  Id. at 305 (citing In re Prudential, 148 F.3d at 333).

When a district court uses the percentage of recovery method, it "first calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case."  In re Cendant, 264 F.3d at 256.  "The percentage will be based on the net settlement fund after deducting the costs of litigation."

In re Aetna, 2001 WL 20928, at *14 (citing In re Ikon, 194 F.R.D. at 193). The net Settlement Fund in this case, as of August 1, 2006, is $27,393,384.51. Consequently, the requested fee of $7.5 million would result in a percentage of recovery of 27.4%.

In Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000), the Third Circuit directed the district courts to consider the following seven factors when determining whether a percentage of recovery fee award is reasonable:

> (1) the size of the fund created and the number of persons benefitted;
> (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Id. at 195 n.1; see also In re Rite Aid, 396 F.3d at 301. "Since this is a flexible and fact-driven determination," In re Aetna, 2001 WL 20928, at *14, district courts are not limited to the Gunter factors in their analysis of the fee request's reasonableness. As the Third Circuit recently noted:

> This list [of Gunter factors] was not intended to be exhaustive. . . . In Prudential, we noted three other factors that may be relevant and important to consider: (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any 'innovative' terms of the settlement. . . . In reviewing an attorneys' fees award in a class action settlement, a district court should consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case.

In re AT&T, 2006 WL 2021033, at *4 (citing In re Prudential, 148 F.3d at 338-340). While the district courts should "engage in robust assessments of the fee award reasonableness factors when

evaluating a fee request," In re Rite Aid, 396 F.3d at 302, these factors "'need not be applied in a formulaic way' because each case is different, 'and in certain cases, one factor may outweigh the rest.'" In re AT&T, 2006 WL 2021033, at *4 (quoting In re Rite Aid, 396 F.3d at 301); see also In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 736 (3d Cir. 2001) ("[A] district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case.").

Having thoroughly reviewed the facts of this case in light of the Gunter and Prudential factors[11] and having applied the lodestar cross-check to this analysis, the Court concludes that Plaintiffs' Counsel's request for $7.5 million in attorneys' fees is reasonable.

### 1.   Size of fund created and number of persons benefitted

Pursuant to the Settlement Agreement, the Settlement Class will obtain an immediate cash benefit of $27,783,836.97, less attorneys' fees, expenses, and incentive award payments as awarded by the Court.  As of August 1, 2006, approximately sixty-eight Class Members had filed Proof of Claim forms and so were in a position to recover from the Settlement Fund, without having to go through the time, expense, and risk of continued litigation.  (Glenn Aff. ¶ 13.)  While the number of claimants which stand to be benefitted in this Settlement is fairly small, these claimants comprise nearly half of the 143 Settlement Class Members to whom individual Notice was originally mailed and they account for over 60% of the tape purchases by those Class Members from 3M during the relevant period.  (Id.)  As discussed above, the Settlement Fund was calculated to provide Class Members with a recovery amounting to approximately 2% of what they paid to 3M for invisible and

---

[11]The Court has determined that, in this case, all considerations relevant to its analysis of the fee award's reasonableness are covered fully by the Gunter and Prudential factors listed above.

transparent tape for home or office use during the period from October 2, 1998 to February 10, 2006, a recovery that compares favorably with other class action antitrust settlements. Thus, although the number of entities positioned to recover a share of the Settlement Fund is fairly small, both the percentage of relevant purchases which those entities represent as well as the substantial and comparatively favorable size of the Fund obtained by Plaintiffs' Counsel weigh in favor of the requested fees.

> 2.     <u>Presence or absence of substantial objections by members of the class</u>

There have been no objections either to the Settlement Agreement or to the requested attorneys' fees. As detailed above, Notice and Summary Notices were disseminated by mail and publication to potential Class Members. The Notice clearly disclosed Plaintiffs' Counsel's intention to request the lesser of $7.5 million or one-third of the Settlement Fund in fees to be paid from the Settlement Fund, and also detailed the procedure by which any Class Member could object to that request. The absence of objections to the requested attorneys' fees in this case is particularly notable given the sophisticated nature of the absent Class Members. <u>See</u> <u>In re Remeron Direct Purchaser Antitrust Litig.</u>, Civ. A. No. 03-0085, 2005 U.S. Dist. LEXIS 27013, at *35 n.1 (D.N.J. Nov. 9, 2005) ("When a class is comprised of sophisticated business entities that can be expected to oppose any request for attorney fees they find unreasonable, the lack of objections 'indicates the appropriateness of the [fee] request.'" (alteration in original) (quoting <u>Cimarron Pipeline Constr., Inc. v. Nat'l Council on Comp. Ins.</u>, Civ. A. Nos. 89-822, 89-1186, 1993 WL 355466, at *1-2 (W.D. Ok. June 8, 1993))); <u>Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.</u>, Civ. A. No. 03-4578, 2005 WL 1213926, at *10 (E.D. Pa. May 19, 2005) (finding that this factor weighs in favor of approval because, "[a]lthough the Settlement Class in this case is relatively small and consists of sophisticated

businesses, not one member of the Settlement Class objected to the requested fee"). The Court finds that this total absence of objections to the requested fees weighs in favor of approval.[12]  See In re Linerboard Antitrust Litig., MDL No. 1261, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004) ("The absence of objections supports approval of the Fee Petition."); In re Rent-Way Sec. Litig., 305 F. Supp. 2d 491, 515 (W.D. Pa. 2003) ("[T]he absence of substantial objections by other class members to the fee application supports the reasonableness of Lead Counsels' request."); In re Aetna, 2001 WL 20928, at *15 ("[T]he Class members' view of the attorneys' performance, inferred from the lack of objections to the fee petition, supports the fee award.").

### 3.   Skill and efficiency of the attorneys involved

The skill and efficiency of Plaintiffs' Counsel is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." In re Ikon, 194 F.R.D. at 194 (citation omitted). As discussed above, Plaintiffs' Counsel are highly experienced in complex antitrust class action litigation (Small Decl. ¶¶ 62-64, Exs. 8-10) and have obtained a significant settlement for the Class despite the complexity and challenges of this case. Defense Counsel are also very experienced in complex class action antitrust litigation and have defended this suit skillfully. Accordingly, the Court finds that this factor favors approval of the requested fees.

### 4.   Complexity and duration of the litigation

---

[12]The import of this absence of objections, while significant, should not be overstated. As the Third Circuit has noted, "[c]lass members may have little incentive to oppose a fee request, since any reduction will only result in a minor increase in their share of the settlement." In re AT&T, 2006 WL 2021033, at *6.

As discussed above, Plaintiffs' Counsel had been litigating this action for roughly one year when the Settlement Agreement was reached.  While a duration of one year is not especially long, during that time Plaintiffs' Counsel engaged in extensive coordinated discovery, participated in multiple depositions as well as expert consultations, briefed and argued 3M's Motion to Dismiss, briefed Meijer's Motion for class certification, prepared for and participated in the mediation, and negotiated the terms of the Settlement Agreement.  Antitrust class actions such as this one are "arguably the most complex action[s] to prosecute."  In re Linerboard, 2004 WL 1221350, at *10 (quotation omitted).  While the LePage's decision and the collateral estoppel ruling in Bradburn favored the Plaintiffs in this action, Plaintiffs' Counsel nonetheless faced complex challenges in establishing liability and damages in this case, as discussed above.  Accordingly, the Court finds that this factor weighs in favor of the reasonableness of the requested fees.

5.     Risk of nonpayment

Plaintiffs' Counsel's compensation for their services in this case was wholly contingent on the success of the litigation.  (Small Decl. ¶ 61.)  Given the risks of establishing liability and damages discussed above, as well as the possibility that this case could not be maintained as a class action through trial, the possibility of non-payment has been present throughout this litigation.  Accordingly, the Court finds that this factor weighs in favor of the requested fees.

6.     Amount of time devoted to the case by Plaintiffs' counsel

Plaintiffs' Counsel devoted slightly over 4,500 hours of work on this litigation from the inception of the claims through August 1, 2006.  (Small Decl. II ¶ 12.)  This is a relatively small amount of time for a settlement class action of this size.  See, e.g., Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 Class Action Rep.

167-234 (2003) (surveying, *inter alia*, class action cases that resulted in a recovery of $20-30 million and indicating that, of the 23 such cases which reported total hours awarded toward attorneys' fees, only one reported a total of less than 6,000 hours). While "[t]he Court recognizes that Plaintiffs' counsel should not be penalized for prosecuting this case in an efficient manner," the Court nonetheless "may consider the amount of time devoted to a case by counsel as disfavoring the requested fee." Stop & Shop, 2005 WL 1213926, at *12. Consequently, the Court finds that the amount of time devoted to this case by Plaintiffs' Counsel weighs against the requested fees.

7. <u>Awards in similar cases</u>

This factor requires the Court to compare the percentage of recovery requested as a fee in this case against the percentage of recovery awarded as a fee in other common fund cases in which the percentage of recovery method, rather than the lodestar method, was used. <u>In re Cendant Corp. PRIDES Litig.</u>, 243 F.3d at 737. As stated above, Plaintiffs' Counsel's request for attorneys' fees in this case produces a 27.4% percentage of recovery.

The Court finds that this percentage of recovery falls within a reasonable range of awards in similar cases. "In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 33 per cent range." 4 Herbert B. Newberg & Alba Conte, <u>Newberg on Class Actions</u> § 14:6 (4th ed. 2006). In <u>In re Rite Aid</u>, the Third Circuit noted three studies which found that fee awards ranging between 25-33% of the common fund were not unusual. <u>In re Rite Aid</u>, 396 F.3d at 303 ("[O]ne study of securities class action settlements over $10 million . . . found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period . . . found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million

. . . found recoveries in the 25-30% range were 'fairly standard.'") (citation omitted).  In 2003, the Class Action Reporter published a survey of fee awards in common fund class actions.  See Logan et al., supra.  This survey included 65 cases that fell within the $20-30 million recovery range; these cases averaged a percentage of recovery of 25.8%.[13]  Id. at 174.

In addition to considering the survey data, the Court notes that attorneys' fee awards ranging between 20-33% of common funds comparably sized to the present Settlement Fund have been approved by judges within the Third Circuit on numerous occasions.  See, e.g., In re Ravisent Technologies, Inc. Sec. Litig., Civ. A. No. 00-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) (noting that "courts within th[e Third Circuit] have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses."); In re Rent-Way, 305 F. Supp. 2d at 519 (approving attorneys' fees award of 25% of a $25 million settlement fund); In re Warfarin, 212 F.R.D. at 262-63 (approving 22.5% of $44.5 million settlement); Lazy Oil Co. v. Witco Corp., 95 F. Supp. 2d 290, 322-23 (W.D. Pa. 1997) (approving 28% of an $18.9 million settlement fund).  Accordingly, the Court finds that Plaintiffs' Counsel's request does not substantially deviate from the percentage of recovery awarded as fees in similar common fund cases, and that this factor favors the requested fees.

The Court concludes that, of the seven Gunter factors, only one - the amount of time devoted to the case by Plaintiffs' Counsel - disfavors the requested award of attorneys' fees in this case.  This one factor is outweighed by the other Gunter considerations that favor the requested award.  Accordingly, the Court finds that, under the Gunter analysis, the percentage of recovery requested as

---

[13]This survey calculated percentage of recovery by lumping the awards of attorneys' fees and expenses and dividing that sum by the aggregate class recovery, which differs from the methodology employed by the Court.  For the sake of comparison, applying this survey's method of calculation to the present case would render a percentage of recovery for Plaintiffs' Counsel of 28.4%.

attorneys' fees in this case is reasonable.

        8.    <u>The Prudential factors</u>

      The Court's assessment of Plaintiffs' Counsel's request for attorneys' fees in light of the three <u>Prudential</u> factors is consistent with the Court's finding of reasonableness under the <u>Gunter</u> factors. The first <u>Prudential</u> factor is intended to measure whether "the entire value of the benefits accruing to class members is properly attributable to the efforts of class counsel," <u>In re AT&T</u>, 2006 WL 2021033, at *11, or if some of those benefits are more properly attributed "to the efforts of other groups, such as government agencies conducting investigations." <u>Id.</u> at *4 (citing <u>In re Prudential</u>, 148 F.3d at 338). While Plaintiffs' Counsel were not aided in their prosecution of this case by a government investigation, Plaintiffs' Counsel did have the benefit of prior litigation which assigned liability to 3M for the same sort of anti-competitive conduct that has been alleged here. <u>Compare</u> <u>Stop & Shop</u>, 2005 WL 1213926, at *12 ("[T]his action was riskier than many other antitrust class actions because there was no prior government investigation, or prior finding of civil or criminal liability based on antitrust violations, in this case."). The Court finds that this factor is neutral with respect to the reasonableness of the requested attorneys' fees.

      As for the second <u>Prudential</u> factor, the Court finds that the 27.4% percentage of recovery requested in this case is comparable to the likely "percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained." <u>In re</u> <u>AT&T</u>, 2006 WL 2021033, at *4 (citing <u>In re Prudential</u>, 148 F.3d at 340). <u>See</u> <u>In re Remeron Direct</u> <u>Purchaser Antitrust Litig.</u>, 2005 U.S. Dist. LEXIS 27013, at *46 ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation."); <u>see</u> <u>also</u> <u>In re Aetna</u>, 2001 WL 20928, at *14 ("[A]n award of thirty percent is in line with what is

43

routinely privately negotiated in contingency fee tort litigation."); In re Ikon, 194 F.R.D. at 194 ("[I]n private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery.").   With respect to the third Prudential factor, the Settlement here contains no particularly "innovative" terms to argue in favor of the requested award of attorneys' fees.  In re AT&T, 2006 WL 2021033, at *4 (citing In re Prudential, 148 F.3d at 339).  In sum, the Court finds that the Prudential factors are largely neutral with respect to Plaintiffs' Counsel's request, and thus that they do not alter the Court's conclusion of reasonableness under the Gunter factors.  Accordingly, the Court finds that the percentage of recovery requested by Plaintiffs' Counsel for attorneys' fees in this case is reasonable.

9.    Lodestar cross-check

The Third Circuit has suggested that, in addition to reviewing the fee award reasonableness factors, "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method."  In re Rite Aid, 396 F.3d at 305 (citing In re Prudential, 148 F.3d at 333).  The lodestar is calculated by "multiplying the number of hours worked by the normal hourly rates of counsel.  The court may then multiply the lodestar calculation to reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation."  In re Aetna, 2001 WL 20928, at *15 (citing In re Ikon, 194 F.R.D. at 195).  "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award."  In re Rite Aid, 396 F.3d at 306.  The cross-check, however, "does not trump the primary reliance on the percentage of common fund method."  Id. at 307.  Moreover, "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district

courts may rely on summaries submitted by the attorneys and need not review actual billing records. . . . [T]he resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." Id. at 306-07 (footnotes and citations omitted).  It is appropriate for the court to consider the multipliers utilized in comparable cases.  Id. at 307 n.17.

The total lodestar amount submitted to the Court by the three firms comprising Plaintiffs' Counsel in this case is $1,572,775.50 for 4,508.55 hours of attorney and paralegal time.[14]  (Small Decl. II ¶ 12.)  The lodestar amount covers work done from the inception of the claims in this action through August 1, 2006, and is calculated at each firm's current rates, which are based on the prevailing rates for cases of this type in the community in which the attorneys practice.  (Small Decl. ¶ 67; Small Decl. II ¶¶ 9-11.)  The hours worked were recorded contemporaneously in the books and records that the firms maintained in the ordinary course of business; they do not include any work done in connection with Plaintiffs' Counsel's application for fees.  (Id.)  The lodestar amount, taken against the requested fee award of $7.5 million, results in a lodestar multiplier of 4.77.

The Third Circuit has recognized that multipliers "'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'"  In re Cendant PRIDES, 243 F.3d at 742 (quoting In re Prudential, 148 F.3d at 341).  While a 4.77 multiplier is slightly above average, it is not far outside the range of normal awards.  See In re Linerboard, 2004 WL 1221350, at *16 (noting that "during 2001-2003, the average multiplier approved in common fund class actions was 4.35") (citing Logan, et al., supra, at 167).  Moreover, the lack of objections by this Class of

---

[14]The breakdown amidst the three firms is as follows: CMHT, indicating a lodestar of $944,551 for 2,885.05 hours (resulting in an hourly rate of $327.40); VVM, indicating a lodestar of $436,199 for 1,133.60 hours (hourly rate of $384.79); and TRR, indicating a lodestar of $192,025.50 for 489.90 hours (hourly rate of $391.97).  (Small Decl. ¶ 69, Small Decl. II ¶ 12.)

sophisticated parties to Plaintiffs' Counsel's request for fees supports the resulting multiplier.  See

Stop & Shop, 2005 WL 1213926, at *18 (noting that "the high lodestar multiplier (15.6) which results

from the Court's award of attorneys' fees in this case is neutralized . . . by the extraordinary support

Plaintiffs have shown for counsels' request for fees.  Not one member of the Settlement Class, which

is made up of approximately 90 sophisticated businesses, objected").  Accordingly, the Court finds

that, given the facts of this case, the requested lodestar multiplier of 4.77 is acceptable and does not

call for a reduction in Plaintiffs' Counsel's requested attorneys' fees award.

Having thoroughly reviewed Plaintiffs' Counsel's request for attorneys' fees, the Court

concludes that the percentage of recovery requested by Plaintiffs' Counsel is reasonable, and that the

lodestar cross-check is consistent with a finding of reasonableness.  Accordingly, the Court approves

Plaintiffs' Counsel's request for $7.5 million in attorneys' fees to be paid from the Settlement Fund.

C.      Incentive Award to Representative Plaintiffs

Meijer has asked the Court to approve an incentive award in the amount of $25,000 to be paid

from the Settlement Fund, because Meijer allegedly has spent a significant amount of its own time

and expense litigating this case for the absent members of the Settlement Class.  "'Courts routinely

approve incentive awards to compensate named plaintiffs for the services they provided and the risks

they incurred during the course of the class action litigation.'"  Cullen v. Whitman Med. Corp., 197

F.R.D. 136, 145 (E.D. Pa. 2000) (quoting In re S. Ohio Corr. Facility, 175 F.R.D. 270, 272 (S.D. Ohio

1997)).  It is particularly appropriate to compensate named representative plaintiffs with incentive

awards when they have actively assisted plaintiffs' counsel in their prosecution of the litigation for

the benefit of the class.  See Tenuto v. Transworld Sys., Inc., Civ. A. No. 99-4228, 2002 WL 188569,

at *5 (E.D. Pa. Jan. 31, 2002); see also In re Linerboard, 2004 WL 1221350, at *18 ("Like the

46

attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly.") (citing In re Plastic Tableware Antitrust Litig., Civ. A. No. 94-3564, 2002 WL 188569 (E.D. Pa. Dec. 4, 1998)).

Meijer has worked closely with Plaintiffs' Counsel throughout the investigation, prosecution and settlement of the claims in this litigation. (Mem. in Supp. of Pls.' Counsel's Mot. for Attys' Fees, Expenses, and Incentive Award at 21.)  Furthermore, the Notice advised Class Members that Meijer would apply for an incentive award in this amount and there were no objections to the award. See In re Remeron Direct Purchaser Antitrust Litig., 2005 U.S. Dist. LEXIS 27013, at *50.  Lastly, the incentive award requested in this case is similar to the awards approved in comparable complex class actions in this District. See id. at *52 (approving a total incentive award of $60,000 to two named plaintiffs); In re Linerboard, 2004 WL 1221350, at *19 (approving incentive awards of $25,000 to each of five named plaintiffs); In re Residential Doors Antitrust Litig., MDL No. 1039, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) (approving $10,000 incentive awards to each of four named plaintiffs).  Accordingly, the Court approves the requested incentive award.

V.    CONCLUSION

For the foregoing reasons, the Court concludes that the Settlement Class meets the certification requirements of Federal Rule of Civil Procedure 23 and approves the Class's final certification for settlement purposes.  The Court also concludes that the Settlement Agreement and Distribution Plan are fair, adequate and reasonable, and approves them.  The Court further concludes that Plaintiffs' Counsel's requested reimbursement of expenses in the amount of $390,452.46 and requested award of attorneys' fees in the amount of $7.5 million are fair and reasonable, and approves them.  Lastly, the Court approves Meijer's request to be paid an incentive award in the amount of

$25,000.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MEIJER, INC. &                          :
MEIJER DISTRIBUTION, INC.,              :
on behalf of themselves and             :
all others similarly situated           :
                                        :        CIVIL ACTION
        v.                              :
                                        :        NO. 04-5871
3M (MINNESOTA MINING                    :
AND MANUFACTURING COMPANY)              :

## FINAL APPROVAL ORDER AND JUDGMENT

WHEREAS Plaintiffs Meijer, Inc. and Meijer Distribution, Inc., on behalf of themselves and each Settlement Class Member (as defined herein), by and through their counsel of record, have asserted claims for damages and injunctive relief against 3M Company, alleging violations of federal antitrust law;

WHEREAS the Plaintiffs and 3M Company, desiring to resolve any and all disputes in this action, executed a Settlement Agreement dated as of February 10, 2006, which was filed with the Court on February 13, 2006;

WHEREAS the Settlement Agreement does not constitute, and shall not be construed as or deemed to be evidence of, an admission of any fault, wrongdoing or liability by 3M Company or by any other person or entity;

WHEREAS 3M Company and each of the Plaintiffs have agreed to entry of this Final Approval Order and Judgment (hereinafter, the "Order");

WHEREAS Plaintiffs, on behalf of themselves and each Settlement Class Member, have agreed to the release of claims specified in the Settlement Agreement;

WHEREAS, on March 28, 2006, this Court granted preliminary approval to the Settlement

Agreement and directed that Notice be given to the Settlement Class as defined in the Settlement Agreement;

WHEREAS, pursuant to the Preliminary Approval Order, Notice of the Settlement was given to members of the Settlement Class, in accordance with Federal Rules of Civil Procedure 23(c)(2) and 23(e) and the requirements of due process, and Settlement Class Members were afforded the opportunity to exclude themselves from the Settlement Class or to object or otherwise comment on the Settlement;

WHEREAS an opportunity to be heard was given to all persons requesting to be heard in accordance with this Court's orders; the Court has reviewed and considered the terms of the Settlement Agreement, the submissions of the parties in support thereof, and the comments received in response to the Notice; and after holding a hearing on August 8, 2006, at which all interested parties were given an opportunity to be heard; and

WHEREAS there is no just reason for delay;

NOW, THEREFORE, before the taking of any testimony, without trial or adjudication of any issue of fact or law herein, without any admission of liability or wrongdoing by 3M Company, and upon the consent of the Settling Parties,

## IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

## I.

## JURISDICTION

1.1.    The Court has jurisdiction over the subject matter of this action and the parties hereto. The Plaintiffs brought this action asserting a claim under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331 and 1337.  Venue is proper in the

Eastern District of Pennsylvania.

## II.

### DEFINITIONS

As used in this Final Approval Order and Judgment, the following definitions shall apply:

2.1.     "3M" or "Defendant" means 3M Company and all of its predecessors, successors and past and present affiliates, subsidiaries, directors, officers, employees and agents.

2.2.     "Class Counsel" means the law firms of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Daar & Vanek, P.C.

2.3.     "Effective Date" means the first date by which all of the events and conditions specified in paragraph 8.1 of the Settlement Agreement have been met and have occurred.

2.4.     "Invisible or transparent tape" means invisible or transparent tape sold within the United States for home and office use, including such products as Scotch® Magic™ tape, Scotch® transparent tape, Highland™ tapes and other invisible or transparent tapes for home and office use, but not including such products as packaging tapes, sealing tapes or masking tapes.

2.5.     "Judgment" refers to this Final Approval Order and Judgment.

2.6.     "Litigation" means the action pending in this Court titled Meijer, Inc., and Meijer Distribution, Inc. v. 3M Company, f/k/a Minnesota Mining and Manufacturing Company, Civil Action No. 04-5871 (JP).

2.7.     "Notice" means, collectively, the communications by which the Settlement Class was notified of the existence and terms of the Settlement.

2.8.     "Notice Plan" means the plan approved in the Preliminary Approval Order for notifying the Settlement Class of the Settlement.

3

2.9.    "Plaintiffs" or "Class Representatives" means Meijer, Inc. and Meijer Distribution, Inc. and each of their parents, subsidiaries, affiliates, assignees, predecessors, successors, officers, directors, employees, agents, and attorneys.

2.10.    "Plaintiffs' Counsel" means the law firms of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Daar & Vanek, P.C. and Trujillo Rodriguez & Richards, LLC.

2.11.    "Released Claims" means the release and discharge of 3M and each of its parents, subsidiaries, divisions, affiliates, assignors, assignees, predecessors, successors, officers, directors, employees, agents and attorneys, from any and all claims asserted, or which could have been asserted, in the Litigation and any and all claims and potential claims, demands, rights, liabilities and causes of action which have arisen or could arise hereafter, whether known or unknown, whether asserted or that could have been or could hereafter be asserted by any member of the Settlement Class or any parent, affiliate or subsidiary of any of such member against 3M and any of its subsidiaries, affiliates, directors, officers, employees and/or agents, concerning or relating in any way to or arising in any way from any 3M discount, rebate, offer, promotion or other sales program or practice (including without limitation, programs claimed to involve the bundling of products or volume or growth rebates) concerning, including or relating in any way to the sale, promotion or distribution of invisible or transparent tape for home or office use in effect from January 1, 1993 to February 10, 2006, including without limitation claims arising under any federal and/or state antitrust laws, unfair competition laws, consumer protection laws or deceptive trade practices acts or any similar statutory or common law provisions, but excluding from this release claims relating to any alleged product defect, personal injury or breach of contract.  With the exception of claims relating to any alleged product defect, personal injury or breach of contract, this release is a "general release" as that term is used in Section

4

1542 of the Civil Code of the State of California and all members of the Settlement Class that have not opted out will expressly waive any rights under that statute or any similar law of any state or territory of the United States or any principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

2.12.   "Settlement" means the settlement contemplated by the terms, conditions and provisions set forth in this Settlement Agreement.

2.13.   "Settlement Agreement" means the Settlement Agreement dated as of February 10, 2006 by and among Plaintiffs Meijer, Inc. and Meijer Distribution, Inc., on behalf of themselves and each Settlement Class Member, and Defendant 3M Company, including all exhibits thereto.

2.14.   "Settlement Agreement Date" means February 10, 2006, the date as of which the Settling Parties entered into the Settlement Agreement.

2.15.   "Settlement Class" means all persons and entities that purchased invisible or transparent tape directly from 3M, or any subsidiary or affiliate thereof, in the United States at any time during the period from October 2, 1998 to February 10, 2006 and also purchased for resale under the class member's own label, any "private label" invisible or transparent tape from 3M or any of 3M's competitors at any time from October 2, 1988 to February 10, 2006; but excluding 3M Company, its subsidiaries, affiliates, officers, directors, and employees and excluding those persons or entities that timely and validly request exclusion from the Settlement Class.

2.16.   "Settlement Class Member" means any person or entity, including but not limited to each individual representative plaintiff, that satisfies all of the requirements for inclusion in the Settlement Class as set forth in paragraph 2.15, and that does not validly request exclusion therefrom.

2.17.   "Settlement Consideration" means the amount paid by 3M to or on behalf of the

5

Settlement Class in exchange for the settlement and release of all Released Claims, as defined in paragraph 2.11 herein.

2.18.    "Settling Parties" means, collectively, each of the Plaintiffs, on behalf of themselves and each Settlement Class Member, and 3M.

## III.

## FINAL APPROVAL OF SETTLEMENT

3.1.    In its Order Preliminarily Approving Settlement, the Court certified the following Settlement Class, for the purpose of this Settlement only:

> all persons and entities that purchased invisible or transparent tape directly from 3M, or any subsidiary or affiliate thereof, in the United States at any time during the period from October 2, 1998 to February 10, 2006 and also purchased for resale under the class member's own label, any "private label" invisible or transparent tape from 3M or any of 3M's competitors at any time from October 2, 1988 to February 10, 2006; but excluding 3M Company, its subsidiaries, affiliates, officers, directors, and employees and excluding those persons or entities that timely and validly request exclusion from the Settlement Class.

3.2.    Attached hereto as Exhibit 1 is the list of persons and entities that timely excluded themselves from the Settlement Class and for which this Final Approval Order and Judgment has no force or effect.

3.3.    The terms of the Settlement Agreement are adjudged to be fair, reasonable and adequate and in the best interests of Plaintiffs and the Settlement Class as a whole, and satisfy the requirements of Federal Rule of Civil Procedure 23(c)(2) and 23(e) and due process.

3.4.    The Court finds that the Notice and the Notice Plan constituted the best notice practicable under the circumstances and constituted due and sufficient notice and that all Settlement Class Members were afforded the opportunity to exclude themselves from participation in this action.

3.5.    The terms of the Settlement Agreement are hereby approved, and the Settling Parties are directed to implement the Settlement in accordance with its terms.

3.6.    The Distribution Plan is adjudged to be fair, reasonable and adequate and is hereby approved and Class Counsel are directed to proceed with the Distribution Plan.

3.7.    No part of the Settlement Consideration provided by 3M pursuant to the Settlement Agreement shall constitute, nor shall it be construed or treated as constituting, a payment in lieu of treble damages, fines, penalties, forfeitures or punitive recoveries under any state or federal laws, rules or regulations, or any other applicable statute or provision.

## IV.

## DISMISSAL OF ACTION AND RELEASES OF CLAIMS

4.1.    This Litigation is dismissed with prejudice and, except as provided in paragraph 5.1 of this Order, without costs.  The Plaintiffs and all Settlement Class Members are barred from further prosecution of the Released Claims.

4.2.    The Court hereby finds that the Released Claims which the Plaintiffs and the Settlement Class Members, on behalf of themselves and, with respect to individuals or individually owned businesses, on behalf of each of their heirs, predecessors, successors, representatives or assigns, and, with respect to corporate entities, on behalf of each of their parents, subsidiaries, affiliates, assignees, predecessors, successors, officers, directors, employees and agents, shall fully and forever release, relinquish and discharge, by operation of this Final Approval Order and Judgment are as defined in paragraph 2.11 of this Order, i.e.,

> the release and discharge of 3M and each of its parents, subsidiaries, divisions, affiliates, assignors, assignees, predecessors, successors, officers, directors, employees, agents and attorneys from any and all claims asserted, or which could have been asserted, in the Litigation

7

and any and all claims and potential claims, demands, rights, liabilities and causes of action which have arisen or could arise hereafter, whether known or unknown, whether asserted or that could have been or could hereafter be asserted by any member of the Settlement Class or any parent, affiliate or subsidiary of any of such member against 3M and any of its subsidiaries, affiliates, directors, officers, employees and/or agents, concerning or relating in any way to or arising in any way from any 3M discount, rebate, offer, promotion or other sales program or practice (including without limitation, programs claimed to involve the bundling of products or volume or growth rebates) concerning, including or relating in any way to the sale, promotion or distribution of invisible or transparent tape for home or office use in effect from January 1, 1993 to February 10, 2006, including without limitation claims arising under any federal and/or state antitrust laws, unfair competition laws, consumer protection laws or deceptive trade practices acts or any similar statutory or common law provisions, but excluding from this release claims relating to any alleged product defect, personal injury or breach of contract.  With the exception of claims relating to any alleged product defect, personal injury or breach of contract, this release is a "general release" as that term is used in Section 1542 of the Civil Code of the State of California and all members of the Settlement Class that have not opted out will expressly waive any rights under that statute or any similar law of any state or territory of the United States or any principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

4.3.    Upon the Effective Date, each Settlement Class Member, on behalf of themselves and, with respect to individuals or individually owned businesses, on behalf of each of their heirs, predecessors, successors, representatives or assigns, and, with respect to corporate entities, on behalf of each of their parents, subsidiaries, affiliates, assignees, predecessors, successors, officers, directors, employees and agents, shall have, shall be deemed to have and by operation of this Judgment shall have fully, finally and forever released, relinquished and discharged 3M and its attorneys from any and all Released Claims and shall be deemed to have covenanted and agreed not to sue 3M or its attorneys with respect to the Released Claims.

4.4.    The following injunction is hereby entered:  All members of the Settlement Class are

permanently enjoined from filing, commencing, initiating, asserting, continuing to prosecute, intervening in, participating in or maintaining in any jurisdiction any action or claim based in whole or in part on any Released Claims, except for proceedings in this action, if any, that are necessary to consummate or enforce the Settlement Agreement or the terms of this Order.

4.5.    Upon the Effective Date, 3M shall be deemed to have, and by operation of the Final Judgment shall have fully, finally and forever released, relinquished and discharged each and all of the Plaintiffs and Plaintiffs' Counsel from all claims arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Litigation, other than claims for breach of the Settlement Agreement.

## V.

## FEES AND EXPENSES AND PLAINTIFF INCENTIVE AWARD

5.1.    The Court approves the award of $7.5 million plus interest that may have accrued on that sum deposited in escrow to pay Plaintiffs' Counsel's attorneys fees plus $390,452.46 to reimburse Plaintiffs' Counsel for payment of costs and expenses reasonably incurred in prosecuting and settling this action.  The award shall be apportioned among Plaintiffs' Counsel by Cohen, Milstein, Hausfeld & Toll, P.L.L.C., subject to review by this Court upon request of any Plaintiffs' Counsel.

5.2.    The Court approves the award of $25,000.00 as an incentive award for Plaintiffs Meijer, Inc. and Meijer Distribution, Inc.

## VI.

## FINALITY OF JUDGMENT

6.1.    The Court finds that this Final Approval Order and Judgment adjudicates all the

claims, rights and liabilities of the parties to the Settlement Agreement and is final and shall be immediately appealable.  Neither this Order nor the Settlement Agreement shall constitute any evidence or admission of liability by 3M, nor shall either document or any other document relating to the Settlement be offered in evidence or used for any other purpose in this or any other matter or proceeding except as may be necessary to consummate or enforce the Settlement Agreement or the terms of this Order or if offered by 3M in responding to any action purporting to assert Released Claims.

## VII.

### RETENTION OF JURISDICTION

7.1.    Without affecting the finality of this Order, the Court retains jurisdiction for the purposes of enforcing the terms of the injunction set forth in paragraph 4.4 of this Order and enabling any of the Settling Parties to apply to this Court at any time for such further orders and directions as may be necessary and appropriate for the construction or carrying out of the Settlement Agreement and this Final Approval Order and Judgment, for the modification of any of the provisions of this Final Approval Order and Judgment, and for the enforcement of compliance herewith.

So Ordered.

Dated this 14th day of August, 2006.

_____
/s/ John R. Padova
Hon. John R. Padova

**EXHIBIT 1**

**Persons and Entities That Timely Excluded Themselves from the Settlement Class**[15]

Costco Wholesale Corporation

---

[15]The United States submitted a letter stating that, under federal law, it "cannot be represented by private counsel in a class action lawsuit" and that "[a]s a result, the United States Attorney General does not agree to the inclusion of the federal government as a class member in this Rule 23 litigation."